FOX ROTHSCHILD LLP
Mitchell Berns
Yann Geron
Oksana Wright
Kathleen Aiello
100 Park Avenue, 15th Floor
New York, New York 10017
Telephone: (212) 878-7900
Facsimile: (212) 692-0940

*Attorneys for Defendant, Federal Home
Loan Bank of New York*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | Chapter 11 Case |
| LEHMAN BROTHERS HOLDINGS | : | |
| INC., | : | Case No. 08-13555 (SCC) |
| | : | |
| Debtor. | : | (Jointly Administered) |

-------------------------------------------------------x

| | | |
|---|---|---|
| Lehman Brothers Holdings Inc., in its ca-pacity as Plan Administrator on behalf of Lehman Brothers Special Financing Inc., | : : : | |
| | : | |
| Plaintiff, | : | |
| | : | Adv. Pro. No. 15-01110 (SCC) |
| -against- | : | |
| | : | |
| FEDERAL HOME LOAN BANK OF NEW YORK, | : : | |
| | : | |
| Defendant. | : | |

-------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

SUMMARY OF RELIEF SOUGHT ........................................................................................1

THE BANK'S TERMINATION OF ITS LEHMAN SWAPS .....................................................2

THE SWAPS VALUATION DISPUTE .....................................................................................6

THE COMPLAINT AND THIS MOTION ................................................................................9

ARGUMENT ........................................................................................................................10

    1.  Standard of Review ...................................................................................................10

    2.  The Fair Dealing Claim Should Be Dismissed (Count II) ...............................................10

    3.  The Equitable Subordination Claim Should Be Dismissed (Count V) ...........................14

CONCLUSION ....................................................................................................................16

i

# TABLE OF AUTHORITIES

### Cases

*80 Nassau Assocs. v. Crossland Federal Svgs. Bank (In re 80 Nassau Assocs.)*,
169 B.R. 832 (Bankr. S.D.N.Y. 1994) ....................................................................15

*Amcan Holding, Inc. v Canadian Imperial Bank of Commerce*
70 AD3d 423 (1st Dep't 2010) ...............................................................................11

*Ashcroft v. Iqbal*,
556 U.S. 662, 129 S.Ct. 1937 (2009) .....................................................................10

*B. Lewis Productions, Inc. v. Maya Angelou and Hallmark Cards, Inc.*,
2005 WL 1138474 (S.D.N.Y. May 12, 2005) .........................................................12

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544, 127 S.Ct. 1955 (2007) .....................................................................10

*Benjamin v. Diamond (In re Mobile Steel Co.)*
563 F.2d 692 (5th Cir. 1977) ..................................................................................14

*Canstar v. J.A. Jones Constr. Co.*,
212 A.D.2d 452, 622 N.Y.S.2d 730 (1st Dep't 1995) .............................................12

*E.E.O.C. v. Staten Island Sav. Bank*,
207 F.3d 144 (2d Cir.2000) ....................................................................................10

*Englehard Corp. v. Research Corp.*,
268 A.D.2d 358, 702 N.Y.S.2d 255 (1st Dep't 2000) .............................................12

*Fasolino Foods Co. v. Banca Nazionale Del Lavoro*,
961 F.2d 1052 (2d Cir. 1992) .................................................................................11

*Finance One Public Company Limited v. Lehman Brothers Special Financing, Inc.*,
215 F. Supp. 2d 395 (S.D.N.Y. 2002) .....................................................................11

*Harris v. Provident Life & Accident Ins. Co.*,
310 F.3d 73 (2d Cir. 2002) .....................................................................................11

*Kosher Provisions, Inc. v. Blue & White Food Products Corp.*,
No. CV-04-361, 2005 WL 1890039 (E.D.N.Y. Aug. 9, 2005) .................................12

ii

*In re Lehman Brothers Holdings Inc.,*
515 B.R. 171 (Bankr. S.D.N.Y. 2014) ........................................................................10

*Lehman Bros. Intern. (Europe) v. AG Financial Products, Inc.,*
2013 WL 1092888 (Sup. Ct. N.Y. Co. Mar. 12, 2013) ..............................................11

*Lightsquared LP, et al. v. SP Special Opportunities LLC (In re LightSquared, Inc.),*
511 B.R. 253 (Bankr. S.D.N.Y. 2014) ................................................................. 14, 16

*MBIA Ins. Corp. v Merrill Lynch,*
81 A.D.3d 419 (1st Dep't 2011) ................................................................................11

*TeeVee Toons, Inc. v. Prudential Sec. Credit Corp., LLC,*
8 A.D.3d 134, 778 N.Y.S.2d 274 (1st Dep't 2004) ...................................................12

*Travelers Indem. Co. of Ill. v. CDL Hotels USA, Inc.,*
322 F. Supp. 2d 482, 494 (S.D.N.Y. 2004) ...............................................................12

*Washington v. Kellwood Co.,*
No. 05 CIV. 10034 (DAB), 2009 WL 855652 (S.D.N.Y. Mar. 24, 2009)...................13

The Federal Home Loan Bank of New York ("Bank") respectfully submits this memorandum of law, together with the Declaration of Mitchell Berns, in support of its motion to dismiss Counts II and V of the complaint asserted by Lehman Brothers Holdings Inc. ("LBHI") as plan administrator for Lehman Brothers Special Financing Inc. ("LBSF", and, together with LBHI, "Lehman").

## SUMMARY OF RELIEF SOUGHT

The Bank brings this motion to streamline the pleadings to permit more efficient discovery and pretrial proceedings.  Lehman's complaint (Ex. 1 to Berns Dec.) challenges the Bank's calculation of its gain on terminating 356 complex interest rate swaps with LBSF in the wake of LBHI's bankruptcy filing.  Lehman contends that the Bank breached the swaps contract and violated § 562 of the Bankruptcy Code by underestimating its gain on terminating the swaps, which was payable to Lehman under the contract.  According to Lehman, this resulted in the Bank's assertion of an inflated bankruptcy claim for the return of excess collateral held by LBSF.  Lehman claims that, properly calculated, the Bank owes it over $150 million.  Counts I, III and IV of the complaint concern this basic claim.

The Bank seeks dismissal of the two remaining counts.  Count II alleges that the Bank breached the implied covenant of good faith and fair dealing by miscalculating its gain on terminating the swaps.  The Bank seeks dismissal of this claim as duplicative of the breach of contract claim alleged as Count I.

In the event the Bank's calculation of its gain on termination is sustained and results in a positive bankruptcy claim against Lehman, Count V seeks equitable subordination of that claim.  Lehman alleges that the Bank engaged in inequitable conduct by misrepresenting in its original

1

bankruptcy claim materials whether certain swaps were replaced. This claim should be dismissed because, before suit was commenced, the Bank eliminated any potential harm to creditors arising from the alleged inequitable conduct by reducing its bankruptcy claim, mooting any grounds for equitable subordination.

**THE BANK'S TERMINATION OF ITS LEHMAN SWAPS**

The Bank is a government sponsored enterprise. It makes wholesale secured loans, called advances, to over 300 member financial institutions located in New York, New Jersey, Puerto Rico, and the U.S. Virgin Islands, primarily to help finance residential mortgage lending by its members. The Bank uses interest rate swaps to manage the interest rate risk inherent in its lending and investment activities.

The Bank had 356 complex interest rate swaps outstanding with LBSF with a notional value totaling $16.5 billion when LBHI filed bankruptcy on September 15, 2008. The swaps were made under a master agreement on the 1992 ISDA form ("Agreement", Ex. 2 to Berns Dec.). LBHI guaranteed LBSF's obligations under the Agreement.

The swaps generally required the Bank to make periodic fixed payments to LBSF, and required LBSF to make periodic floating payments to the Bank. The fixed payments were based on a long-term interest rate prevailing at the time the swaps were executed. The floating payments were generally based on the three-month inter-bank lending rate (LIBOR) prevailing at the time such payments were to be made. Interest rates were generally higher when the swaps were executed than at the time LBHI failed in September 2008.

As interest rates declined, the projected stream of floating-rate amounts that LBSF would be required to pay the Bank became less valuable than the stream of fixed payments due from the Bank. This created a projected payment gap in Lehman's favor. As of LBHI's bankruptcy filing

2

date, the swaps were therefore "in the money" to LBSF, meaning that, on a net basis, LBSF was expected to receive a substantial sum from the Bank over the life of the swaps.

Most of the swaps had an option feature giving LBSF a periodic right to cancel the swap before maturity. This option was valuable to Lehman, and its value fluctuated as interest rates changed or became more or less volatile. The option feature added complexity that made the swaps relatively difficult to price and replace in bulk in the disrupted and illiquid swaps market prevailing in the wake of LBHI's collapse.

The Agreement required the Bank to collateralize the 'in the money" value of the swaps in LBSF's favor. As of September 15, 2008, the Bank had posted about $510 million cash collateral with LBSF to secure this exposure. Recovering this collateral from Lehman became a key consideration in the Bank's response to LBHI's failure.

The Bank terminated the swaps on September 18, 2008 (the "Early Termination Date" or "ETD"), shortly after it became clear that Barclays Bank PLC would not acquire and assume Lehman's swaps obligations. The Bank replaced most of the terminated swaps as quickly as possible with new counterparties in order to maintain its hedges and limit its collateral exposure to Lehman. The replacement swaps had the same terms as the terminated LBSF swaps, which meant that, at inception, they were generally "in the money" for the new counterparties, just as the corresponding terminated swaps had been "in the money" for LBSF.

The fact that the terminated swaps were substantially "in the money" complicated the Bank's effort to replace them, as the replacement swaps would likewise be "in the money" for new counterparties. This meant that any dealers executing replacement swaps would have to make large up-front payments to the Bank, totaling several hundred million dollars, to compensate it for the "in the money" value the new counterparties were receiving. Any dealers bidding

3

on replacement swaps would therefore have to be willing to commit substantial amounts of scarce capital in an illiquid market, in addition to having to value large numbers of swaps with embedded option features in order to bid on replacement transactions.

The Bank was well motivated to replace the terminated swaps quickly. First, it needed to maintain its hedges. Second, in the face of potentially rising interest rates resulting in declining swap values, the Bank needed to maximize the replacement payments to be received from its new counterparties. Under the Agreement, any replacement payments received by the Bank would be credited to LBSF. This credit would reduce the amount of collateral LBSF was obliged to refund to the Bank. The Bank's goal was to obtain payments from new counterparties sufficient to substantially reduce or eliminate LBSF's $510 million collateral refund obligation. Any lag in executing replacement trades could potentially reduce the magnitude of replacement payments and increase the shortfall between those payments and the $510 million collateral held by Lehman. The higher the shortfall, the greater the Bank's credit exposure could be in the LBHI bankruptcy, and potentially to LBSF as well.

So, after deciding to terminate the swaps, the Bank was motivated to replace them expeditiously for as much value as possible. It did so under the difficult and disrupted market conditions prevailing in the wake of LBHI's filing. It sought bids from dealers who were swamped with demand from other swaps users who were likewise crowding into the market to replace terminated Lehman swaps. In such chaotic circumstances, the dealers dropped their bids well below the values indicated by the computer models they typically used to bid on swaps in normal markets.

The Bank acted in a commercially reasonable and sensible manner to obtain actionable bids from swaps dealers and promptly execute replacement swaps. It broke the swaps portfolio

4

into a series of blocks containing swaps with similar features to make them more readily market-able to dealers in a disrupted and illiquid market. Each block was marketed to several dealers. The Bank obtained the highest prices available from the few dealers willing to bid.

The Bank managed to replace the three most valuable swaps blocks comprising 130 swaps within two trading days after the ETD. In connection with these replacements, the Bank received $443,500,000 from its new swap counterparties. This payment represented 91% of the total net payment the Bank received with respect to the 329 termination LBSF swaps that were replaced. Most of the remaining blocks were replaced by the end of September 2008, and some swaps were replaced in October and November. Twenty-seven swaps were never replaced, be-cause they were near expiration or otherwise unsuitable candidates for replacement.

After replacing the swaps, the Bank computed its "Loss" under the Agreement, which requires the Bank to "reasonably determine in good faith" its total loss or gain from terminating the swaps (Agreement, § 14, "Loss" definition). Under the contract close-out method selected by the parties in the Agreement, if the Bank suffered a net loss in terminating the swaps, that loss would be recoverable from LBSF. Here, where the Bank experienced a net gain on termination, that gain was payable to LBSF.[1]

To fix the amount of its gain on termination, the Bank (1) credited LBSF for the replace-ment payments it received from its new swap counterparties on all swaps that were replaced by the end of September 2008, (2) calculated an estimated loss on 71 terminated swaps that were not so replaced, (3) made adjustments for periodic swap payments remaining unpaid as of the Early Termination Date and interest, and (4) debited LBSF for the return of the Bank's collateral.

---

[1] The Bank has a bankruptcy claim against Lehman because its gain on termination was less than the collateral due back from Lehman.

The calculation showed that the Bank's net gain on terminating the swaps was about $64.5 million less than the $510 million collateral held by LBSF, resulting in a $64.5 million bankruptcy claim.

In computing its gain on termination, the Bank treated all 71 swaps that had not been replaced by the end of September 2008 as "unreplaced" and used values estimated by computer as of September 19, 2008 for such swaps. Those swaps treated as unreplaced included 44 swaps that were in fact replaced in October and November 2008. In January 2015, several months prior to the commencement of this action, the Bank gave Lehman a recalculation of its claim that used the actual replacement payments received with respect to the 44 later-replaced swaps in lieu of their modelled values to calculate the Bank's gain or loss with respect to those swaps. This recalculation reduced the Bank's claim by $20 million, to $44.5 million. The Bank is amending its claim against LBSF and LBHI in the main proceeding to reflect this reduction.

## THE SWAPS VALUATION DISPUTE

The Bank now claims that, after crediting LBSF with all payments the Bank received from new counterparties in replacing the swaps, and accounting for unpaid swaps payments and other adjustments, it is due $44.5 million, representing the excess collateral retained by Lehman. The Bank was clearly entitled to terminate the swaps upon LBSF's default and calculate damages as it did. LBSF defaulted when its credit support provider, LBHI, filed bankruptcy. The Bank exercised its contractual right to terminate the swaps after that default, and the Agreement's "Loss" provision permits it to calculate its gain on termination so as to preserve for itself, as the non-defaulting party, the benefit of its bargain. It did this by replacing the swaps and crediting the replacement proceeds to LBSF. This put the Bank in the position it would have enjoyed had there been no default.

6

Lehman contends that the Agreement and § 562 of the Bankruptcy Code require the Bank to use computer-generated swap values estimated as of the ETD rather than actual payments it received upon replacing swaps in the marketplace after the ETD to calculate its gain on termination. Lehman's alternative calculation, based on computer modeling performed years after the termination, says the terminated swaps were worth at least $195 million more than the replacement payments actually received by the Bank. So Lehman claims that the Bank must make up the difference. After crediting back the Bank's collateral, Lehman claims that it is owed more than $150 million.

The Bank contends that calculating its gain on termination by totaling the replacement payments it received upon executing new swaps complies with the Agreement. The swaps were replaced shortly after the ETD, and the Agreement grants the Bank the flexibility to measure its gain either as of the ETD or "as of the earliest date thereafter as is reasonably practicable." Agreement, § 14, "Loss" definition. Given the large size and off-market nature of the complex swaps portfolio to be replaced in a disrupted and illiquid market, the Bank's replacement of the bulk of the portfolio within days of the ETD met the "as early as reasonably practicable" standard.

Lehman further contends that, even if the Bank's calculation of its gain passes muster under the Agreement, it ran afoul of § 562, which Lehman says absolutely requires that terminated swaps be valued as of the ETD absent *force majeure* circumstances, such as a market shutdown. Lehman's reading of § 562 fails to recognize its role as a safe harbor provision intended to harmonize Code with contract treatment of swaps, rather than to upend their contractual treatment.

7

Eliminating the ISDA agreement's flexibility to measure termination damages on or as soon as practicable after the ETD, as Lehman seeks to accomplish, would shift unavoidable market losses in the wrong direction, from the defaulting party to the non-defaulting party. This would upend the Agreement's damages standard. The measure of damages would no longer be the non-defaulter's "loss of bargain," or in this case, the Bank's actual gain on terminating the swaps. Rather, Lehman would turn § 562 into a shield to protect the defaulter from the theoretical loss it suffered from a swaps termination measured as of the termination date, whether or not that loss matches the non-defaulter's actual gain on terminating the swaps. Traditional contract damages principles reflected in the ISDA master agreement, requiring damages to be set to preserve the non-defaulter's benefit of the bargain, would be out the window.

In any event, the Bank also contends that § 562 does not apply here because the swaps were terminated well before its counterparty LBSF filed bankruptcy on October 3, 2008. Their termination is therefore governed solely by the Agreement.

Lehman's opportunistic position rests on a basic misconception of the parties' relative status under the Agreement. Lehman ignores LBSF's status as the defaulting party, as well as the effects of LBHI's collapse on the swaps market in which the Bank was forced to execute replacement trades. Lehman also ignores the illiquid and disrupted market conditions confronting the Bank as it worked to replace its Lehman swaps portfolio. LBHI's failure necessarily reduced the amounts the Bank could realize on replacing the swaps and the pace of its replacement trading. Lehman disregards the Agreement's flexibility permitting the Bank the leeway to calculate its gain on termination in a commercially reasonable manner using its actual replacement trade results. And finally, Lehman misreads § 562 to seek a windfall, rather than acknowledging it to

be a safe harbor provision intended to harmonize, rather than conflict with traditional contract damages standards reflected in the Agreement.

## THE COMPLAINT AND THIS MOTION

The complaint sets forth five counts.  Ex. 2 to Berns Dec.  Counts I and III allege that the Bank breached the Agreement and violated § 562 of the Bankruptcy Code by using its actual replacement trade receipts rather than swap values modeled as of the ETD to calculate its gain on the terminating the swaps, and therefore owes LBSF more than $150 million. Count IV correspondingly seeks disallowance and expungement of the Bank's bankruptcy claim against Lehman on the ground that, if Lehman prevails on Counts I and III, nothing is owed.

This motion addresses Counts II and V.  Count II alleges a breach of the implied covenant of good faith and fair dealing based on the same allegations underlying the breach of contract claim.  This claim should be dismissed as duplicative.

Count V seeks equitable subordination of the Bank's claim because of alleged misconduct in the filing of the Bank's original claim.  Lehman alleges that the Bank misrepresented 44 terminated swaps as not having been replaced when in fact they were replaced in October and November 2008.  Even assuming *arguendo* for the purposes of this motion that Lehman's contention is correct, in January 2015, months before this action was commenced, the Bank eliminated any harm to creditors by disclosing the replacement trades to Lehman and reducing its claim by $20 million to account for the impact of using the actual payments received upon replacing these swaps in the claim calculation.  As any impact on creditors has been eliminated, the equitable subordination claim should be dismissed as moot.

9

<u>**ARGUMENT**</u>

**1.    Standard of Review**

"Federal Rule of Bankruptcy Procedure 7012(b), which incorporates Federal Rule of Civil Procedure 12(b)(6) ('Rule 12(b)(6)'), allows a bankruptcy court to dismiss an adversary proceeding if a plaintiff's complaint fails to state a claim upon which relief may be granted."  *In re Lehman Brothers Holdings Inc.*, 515 B.R. 171, 174 -175 (Bankr. S.D.N.Y. 2014).  On a Rule 12(b)(6) motion, the Court accepts the factual allegations of the complaint as true and draws all reasonable inferences in plaintiff's favor.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *E.E.O.C. v. Staten Island Sav. Bank*, 207 F.3d 144, 148 (2d Cir.2000). However, the factual allegations in a complaint must be supported by more than mere conclusory statements. *Twombly*, 550 U.S. at 555; *see also Ashcroft*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

"The allegations must be sufficient to raise a right to relief above the speculative level and provide more than a formulaic recitation of the elements of a cause of action." *In re Lehman Brothers Holdings Inc.*, 515 B.R. at 175 (citations omitted).  Therefore, the Court "may dismiss a complaint unless a plaintiff pleads enough facts to state a claim to relief that is plausible on its face." *Id.* (citations omitted).

**2.    The Fair Dealing Claim Should Be Dismissed (Count II)**

Lehman's claim for breach of the implied covenant of good faith and fair dealing (Count II) should be dismissed because it is duplicative of its breach of contract claim (Count I).  In its contract claim LBHI alleges that the Bank failed to comply with the Agreement's provisions specifying how it, as the non-defaulting party, should calculate its gain or loss upon LBSF's de-

fault.  Compl., ¶57 ("By valuing the Swaps as of various dates over an extended period following

the [ETD] and otherwise failing to use reasonable valuation practices…[the Bank] breached the

Master Agreement.").  In Count II LBHI merely repeats the allegation underlying its contract

claim by contending that the Bank breached the covenant of good faith and fair dealing when it

"refus[ed] to pay LBSF a properly calculated, commercially reasonable termination payment

measured on the [ETD] in accordance with the Loss measure in the Master Agreement…"

Compl., ¶64.

However, "New York law . . . does not recognize a separate cause of action for breach of

the implied covenant of good faith and fair dealing when a breach of contract claim, based upon

the same facts, is also pled," *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d

Cir. 2002), because a "breach of [the] duty is merely a breach of the underlying contract." *Fa-*

*solino Foods Co. v. Banca Nazionale Del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992) (citations

omitted); *see also Lehman Bros. Intern. (Europe) v. AG Financial Products*, Inc., 2013 WL

1092888 (Sup. Ct. N.Y. Co. Mar. 12, 2013) ("A cause of action for breach of the implied cove-

nant will be dismissed as duplicative of a breach of contract cause of action where both claims

arise from the same facts and seek identical damages.") citing *Amcan Holding, Inc. v Canadian*

*Imperial Bank of Commerce*, 70 AD3d 423, 426 (1st Dep't 2010); *see also MBIA Ins. Corp. v*

*Merrill Lynch*, 81 A.D.3d 419, 419-420 (1st Dep't 2011); *Finance One Public Company Limited*

*v. Lehman Brothers Special Financing, Inc.*, 215 F. Supp. 2d 395 (S.D.N.Y. 2002) ("LBSF ar-

gues correctly that a plaintiff may not maintain a good faith and fair dealing claim where the

claim is based upon the same factual allegations and seeks the same damages as the plaintiff's

claim for breach of an express provision of the contract.").

11

New York state and federal courts consistently dismiss claims for breach of the implied duty of good faith and fair dealing as duplicative of breach of contract claims. *See Kosher Provisions, Inc. v. Blue & White Food Products Corp.*, No. CV-04-361, 2005 WL 1890039 (E.D.N.Y. Aug. 9, 2005) (breach of covenant of good faith and fair dealing dismissed where claim rested on defendant's failure to honor purported agreement); *B. Lewis Productions, Inc. v. Maya Angelou and Hallmark Cards, Inc.*, No. 01 Civ. 0530 (MBM), 2005 WL 1138474, at *11 (S.D.N.Y. May 12, 2005) ("[A] party does not have a separate cause of action for breach of the covenant of good faith and fair dealing based on the same facts as the breach of contract claim."); *Travelers Indem. Co. of Ill. v. CDL Hotels USA, Inc.*, 322 F. Supp. 2d 482, 494 (S.D.N.Y. 2004) (breach of covenant of good faith and fair dealing claim dismissed as duplicative of breach of contract claim); *Englehard Corp. v. Research Corp.*, 268 A.D.2d 358, 359, 702 N.Y.S.2d 255, 256 (1st Dep't 2000) (same); *TeeVee Toons, Inc. v. Prudential Sec. Credit Corp., LLC*, 8 A.D.3d 134, 778 N.Y.S.2d 274 (1st Dep't 2004) (affirming dismissal of claim for breach of covenant of good faith and fair dealing as redundant to breach of contract claim); *Canstar v. J.A. Jones Constr. Co.*, 212 A.D.2d 452, 622 N.Y.S.2d 730 (1st Dep't 1995) (affirming dismissal of claim for breach of duty of good faith and fair dealing as duplicative of breach of contract claim).

Lehman failed to plead a cause of action distinct from its contract claim. In both claims Lehman alleges that the Bank improperly relied on actual swap replacement values in measuring its gain or loss under the Agreement and that the Bank should have valued its gain or loss as of the ETD. *Compare* Compl., Count I, ¶56 ("It was reasonably practicable for [the Bank] to calculate the termination payment as of the [ETD], and, therefore, [the Bank] should have valued the early termination payment as of September 18, 2008, the [ETD]."); *id.*, ¶57 ("By valuing the

12

Swaps as of various dates over an extended period following the Early Termination Date and

otherwise failing to use reasonable valuation practices…[the Bank] breached the Master Agree-

ment.") *with* Compl., Count II, ¶64 (claiming that the Bank breached the covenant of good faith

and fair dealing "by refusing to pay LBSF a properly calculated, commercially reasonable termi-

nation payment measured on the [ETD] in accordance with the Loss measure in the Master

Agreement…" ); *see also id.*, ¶59 (The Bank "was fully capable of calculating the termination

payment as of the [ETD]."); *id.*, ¶61 (The Bank "cannot point to any valid excuse for its failure

to measure its Loss on the correct date.").

Furthermore, Lehman's claim for breach of the implied covenant of good faith and fair

dealing must be dismissed because it is entirely based on allegations of the Bank's breach of spe-

cific provisions in the Master Agreement. *See* Compl., ¶64 (claiming that the Bank failed to

"properly" calculate a "commercially reasonable termination payment measured on the Early

Termination Date in accordance with the Loss measure in the Master Agreement…"). When, "a

claim for good faith and fair dealing [is] based on the breach of the terms of [the] agreement" it

"is necessarily duplicative of a breach of contract claim" and should be dismissed. *See Washing-

ton v. Kellwood Co.*, No. 05 CIV. 10034 (DAB), 2009 WL 855652, at *6 (S.D.N.Y. Mar. 24,

2009).

Lehman's good faith and fair dealing claim relies entirely on the provisions of the

Agreement governing the parties' rights and obligations in the event of one party's default.

These include provisions allowing the Bank, as the non-defaulting party, to terminate the swaps

and calculate its gain or loss from such termination, and to pay any gain to, or collect any loss

from, LBSF (Agreement, §§ 5, 6; Schedule, Part 1(f) (selecting Loss and Second Method)), as

well as the "Loss" provision granting the Bank, as the non-defaulting party, broad discretion to

13

"reasonably determine" its gain or loss "in good faith."  *See* Agreement, §§ 6(e)(i)(4) and 14 ("Loss" definition).

Dismissal of the duplicative fair dealing claim may well simplify discovery by avoiding needless excursions into whether this or that conduct of the Bank evidenced a breach of an amorphous standard of "good faith and fair dealing."  Here the basic question is whether the Bank's swaps close-out calculation complied with explicit contractual and statutory standards. There is no need for sideshows that can only result in unnecessary expense and waste.

**3.      The Equitable Subordination Claim Should Be Dismissed (Count V)**

Count V alleges that the Bank's claim should be equitably subordinated in the event the Bank's damage calculation is sustained.  This claim should be dismissed because Lehman has not alleged, and cannot allege, any harm to creditors caused by the allegedly inequitable conduct. Any injury has been eliminated by the Bank's $20 million claim reduction before this action commenced.

To plead a claim for equitable subordination, Lehman must allege that the Bank engaged in inequitable conduct that injured creditors.  *See Lightsquared LP, et al. v. SP Special Opportunities LLC (In re LightSquared, Inc.)*, 511 B.R. 253, 346-47, 349, 352 (Bankr. S.D.N.Y. 2014) (key factors supporting equitable subordination are showing of inequitable conduct and injury to creditors); *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699-700 (5th Cir. 1977). Furthermore, even where equitable subordination is warranted, a claim may be subordinated only to the extent necessary to offset the harm suffered by creditors on account of the inequitable conduct.  *LightSquared*, 511 B.R. at 347, 349.

Lehman complains that, in presenting its original claim, the Bank did not disclose that 44 of the swaps listed as unreplaced were actually replaced in October and November 2008.  These

14

44 later-replaced swaps are part of the 356 terminated swaps at issue, most of which were re-placed in September 2008.

The Bank originally treated any swaps not replaced by September 30, 2008, the end of its fiscal quarter, as "unreplaced" swaps whose value was estimated as of September 19, 2008, one day after the ETD, in calculating the Bank's claim. The Bank treated all swaps replaced after September 2008 as having been replaced too late for the associated replacement payments to be used in calculating the Bank's gain on termination under the Agreement's provision permitting the gain to be determined "as of the earliest … reasonably practicable" date after the ETD. In-stead, the Bank estimated its gain or loss in terminating these swaps by estimating their value as of the day after the ETD.[2]

This treatment essentially complied with the Agreement. However, it also had the effect of increasing the Bank's claim by $20 million over what it would have been had the Bank used the replacement payments it received rather than modeled values to calculate its gain or loss in terminating these swaps. The Bank acted in good faith in conformity with the Agreement in cal-culating its original claim, but it recognizes that determining whether conduct is "inequitable" presents a "slippery" issue generally inappropriate for resolution on a motion to dismiss. *See 80 Nassau Assocs. v. Crossland Federal Svgs. Bank (In re 80 Nassau Assocs.),* 169 B.R. 832, 837, 838 (Bankr. S.D.N.Y. 1994)

Nevertheless, even assuming *arguendo*, at this motion to dismiss stage, that the Bank's handling of the later-replaced swaps was inequitable, any harm to creditors was eliminated in

---

[2] The Bank recognizes that, pursuant to the Agreement terms, the swaps treated as "unreplaced" should have been valued as of September 18, the ETD, not as of the next day. However, the value of these swaps changed only slight-ly between these two dates, so this error had no material impact on the damage calculation.

January 2015, months before this action commenced, when the Bank notified Lehman that it intended to reduce its claim by $20 million.[3]   The Bank notified Lehman at that time that 44 of the swaps previously characterized as "unreplaced" had in fact been replaced in October and November 2008, and that it intended to reduce its claim to account for the impact of using the payments it received upon replacing those swaps in lieu of estimated termination values to calculate its claim.

This claim reduction already gives creditors everything they could achieve through equitable subordination.  If subordination were to be granted, it would be limited to the $20 million difference between the bank's original $64.5 million claim and what the claim would have been had the Bank used the payments it received upon replacing the 44 later-replaced swaps to calculate its original claim.  As the Bank's claim has already been reduced by $20 million, no further subordination could be warranted, *see LightSquared*, 511 B.R. at 347, 349.

Here, Lehman cannot show that creditors would achieve any more through equitable subordination than the benefit already conferred through the Bank's $20 million claim reduction.  The purpose of an equitable subordination – "to restore creditors to the position that they would have been in if the misconduct did not occur," *LightSquared*, 511 B.R. at 350 – has already been achieved.  The creditors have no more to gain through an equitable subordination, so Count V should be dismissed as moot.

## **CONCLUSION**

What is at issue here is the Bank's gain on extinguishing its apparent swap liabilities – its projected obligations to make future net swap payments to LBSF.  The Bank says its gain is best

---

[3] Lehman does not appear to dispute the Bank's recalculation.  The Bank is seeking Court permission to file a claim amendment on consent reflecting the reduced claim amount.

measured by the price it received upon re-issuing those apparent liabilities to new swap counter-parties. That is, what the Bank got paid in replacing the swaps is what it should credit to Lehman. Lehman says that, because the Bank did not replace all its swaps on the ETD, it must instead use computer modeling to value its gain.

If this case concerned the value of a house rather than a swaps portfolio being valued for a termination calculation, Lehman would be in the position of a mortgage lender arguing that an appraisal trumps the house's actual sale price as the best indicator of its value for a loan. Lehman's approach turns the Agreement's practical approach to damages determination as well as § 562 (were it to apply) upside down.

Whether the Bank's use of actual replacement trades rather than theoretical estimates to fix its termination gain makes sense under the Agreement and the law will eventually need to be decided. For now, the Bank seeks only to focus the pleadings on the core issues. Its motion to dismiss Counts II and V should be granted.

Dated:   New York, New York
         July 17, 2015                        FOX ROTHSCHILD LLP


                                     By:   */s/ Mitchell Berns*
                                           _____
                                           Mitchell Berns
                                           Yann Geron
                                           Oksana Wright
                                           Kathleen Aiello
                                           100 Park Avenue, 15th Floor
                                           New York, New York 10017
                                           (212) 878-7900

                                           *Attorneys for Defendant Federal Home*
                                           *Loan Bank of New York*

17