WEIL, GOTSHAL & MANGES LLP
Ralph I. Miller
1300 Eye Street, NW, Suite 900
Washington, DC  20005
Telephone:  (202) 682-7000
Facsimile:  (202) 857-0940

WEIL, GOTSHAL & MANGES LLP
Jacqueline Marcus
767 Fifth Avenue
New York, NY  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Lehman Brothers Holdings Inc.
and Lehman Brothers Special Financing Inc.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC.,<br><br>Debtor. | Chapter 11 Case<br>No. 08-13555 (SCC)<br><br>(Jointly Administered) |
| Lehman Brothers Holdings Inc., in its capacity as Plan Administrator, on behalf of itself and Lehman Brothers Special Financing Inc.<br><br>   Plaintiff,<br><br>v.<br><br>Federal Home Loan Bank of New York<br><br>   Defendant. | Adv. Proc. No. 15-01110 (SCC)<br><br>**OPPOSITION TO MOTION TO DISMISS ADVERSARY COMPLAINT** |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................................1

I.    The Bank Terminated the Swaps and Conducted a Fundamentally Flawed
      Valuation..........................................................................................................................2

II.   The Contract and Governing Law Mandate that the Bank Value the Swaps As Of
      the Early Termination Date...............................................................................................7

LEGAL STANDARD FOR A MOTION TO DISMISS ................................................................8

ARGUMENT .................................................................................................................................9

I.    LBHI's Good Faith Claim Is Well-Pleaded.......................................................................9

II.   LBHI's Equitable Subordination Claim Is Well-Pleaded.................................................14

CONCLUSION............................................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ABF Capital Mgmt. v. Kidder Peabody & Co (In re Granite Partners)*,
    210 B.R. 508 (Bankr. S.D.N.Y. 1997) ....................................................................................16

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...........................................................................................8, 14, 15

*Chamberlain v. City of White Plains*,
    986 F. Supp. 2d 363 (S.D.N.Y. 2013) ..........................................................................16, 17

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002) ...........................................................................................9

*Don King Prods., Inc. v. Douglas*,
    742 F. Supp. 741 (S.D.N.Y. 1990) ...............................................................................10

*Dujardin v. Liberty Media Corp.*,
    359 F. Supp. 2d 337 (S.D.N.Y. 2005) ..........................................................................15

*Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*,
    680 F. Supp. 2d 625 (S.D.N.Y. 2010), *aff'd in relevant part*,
    381 F. App'x 117 (2d Cir. 2010) ..................................................................................10

*In re eSpeed, Inc. Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006) ..........................................................................16

*In re G. Survivor Corp.*,
    217 B.R. 433 (Bankr. S.D.N.Y. 1998) ..........................................................................15

*Grand Heritage Mgmt., LLC v. Murphy*,
    06 Civ. 5977 (NRB), 2007 U.S. Dist. LEXIS 83114 (S.D.N.Y. Nov. 6, 2007) ..................10

*Korova Milk Bar of White Plains, Inc. v. PRE Props., LLC*,
    No. 11 Civ. 3327 (ER), 2013 WL 417406 (S.D.N.Y. Feb. 4, 2013) ........................................8

*Levitt v. Bear Sterns & Co., Inc.*,
    340 F.3d 94 (2d Cir. 2003) .............................................................................................8

*LightSquared LP v. SP Special Opportunities LLC (In re LightSquared Inc.)*,
    511 B.R. 253 (Bankr. S.D.N.Y. 2014) ..................................................................2, 9, 11, 13

*Morgenstein v. Motors Liquidation Co. (In re Motors Liquidation Co.)*,
    462 B.R. 494 (Bankr. S.D.N.Y. 2012) ..........................................................................17

*Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*,
   361 B.R. 369 (Bankr. S.D.N.Y. 2007) (Gropper, J.) ............................................................16

*Rescuecom Corp. v. Google, Inc.*,
   562 F.3d 123 (2d Cir. 2009)...........................................................................................8, 15

*Sapirstein-Stone-Weiss Found. v. Merkin*,
   950 F. Supp. 2d 621 (S.D.N.Y. 2013)...................................................................................8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..............................................................................................................9

*U.S. Gypsum Co. v. Nat'l Gypsum Co.*,
   352 U.S. 457 (1957)......................................................................................................11, 12

Plaintiff Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator on behalf of itself and Lehman Brothers Special Financing Inc. ("LBSF" and, together with LBHI, "Lehman"), by its undersigned attorneys, respectfully submits this opposition to Defendant Federal Home Loan Bank of New York's (the "Bank") Motion to Dismiss Adversary Complaint (the "Motion"), which seeks to dismiss two of the five counts brought by LBHI in its "Complaint" [ECF No. 1] filed on May 13, 2015.

## PRELIMINARY STATEMENT

The Motion attacks two properly asserted claims that merely seek appropriate remedies for the Bank's pattern of wrongful conduct. The Bank has avoided paying over $150 million in principal (and interest) to LBSF as a result of the Bank's termination of 356 derivatives transactions (the "Swaps") for more than six years. During that time, the Bank repeatedly has demonstrated a lack of candor towards LBSF and this Court in its valuation of the Swaps, its post-termination dealings with Lehman, and its proofs of claim filed in the above-captioned chapter 11 proceeding. The Bank now seeks to dismiss LBHI's claims arising from the Bank's own misrepresentations, deliberate concealment of material facts, and inequitable conduct. Yet, the Bank cannot avoid liability on LBHI's well-pleaded claims for breach of the implied covenant of good faith and fair dealing (the "Good Faith Claim"—Count II) or the alternative claim for equitable subordination (the "Equitable Subordination Claim"—Count V), especially given the Bank's concession that "whether conduct is 'inequitable' presents a 'slippery' issue generally inappropriate for resolution on a motion to dismiss." Motion at 15.[1]

Notably, the Bank's Motion does not challenge the sufficiency of LBHI's claims for breach of contract (Count I), violation of section 562 of the Bankruptcy Code (Count III), or

---

[1] *Id.* (citing *80 Nassau Assocs. v. Crossland Fed. Svgs. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 837, 838 (Bankr. S.D.N.Y. 1994)).

disallowance of the Bank's claims and objections to claims (Count IV).  In leaving those claims

alone, the Bank implicitly recognizes the merits of LBHI's core claims.  Instead, the Motion

merely seeks to dismiss LBHI's Good Faith Claim as duplicative of the breach of contract claim,

even though this Court repeatedly has refused to embrace similar arguments.  *See LightSquared*

*LP v. SP Special Opportunities LLC (In re LightSquared Inc.)*, 511 B.R. 253 (Bankr. S.D.N.Y.

2014); *Lehman Brothers Holdings Inc. v. Wellmont Health System (In re Lehman Brothers*

*Holdings Inc.)*, Ch. 11 Case No. 08-13555, Adv. No. 13-01719 (SCC) (Bankr. S.D.N.Y.), Tr. of

Hr'g, Feb. 11, 2015.  Perhaps even more egregiously, the Bank's effort to dismiss LBHI's

alternative Equitable Subordination Claim relies on unsupported factual assertions, is

inappropriate for a Rule 12(b)(6) motion, and lacks any citation to relevant case law.  For these

reasons, the Bank's Motion should be denied in its entirety.

## FACTUAL BACKGROUND

I.    **The Bank Terminated the Swaps and Conducted a Fundamentally Flawed**
      **Valuation.**

The Bank spent the three days following LBHI's filing of its chapter 11 petition on

September 15, 2008 (the "LBHI Petition Date") carefully considering its options and ultimately

electing September 18, 2008 as the "Early Termination Date" (or "ETD") to terminate its

portfolio of 356 separate, unmatured derivative Swaps.  Complaint ¶ 2.  Although the Bank itself

deliberately chose September 18, 2008 as the Early Termination Date, the Bank initially refused

to value ***any*** of the Swaps as of that date, as is required by the ISDA Master Agreement[2] and

section 562 of the Bankruptcy Code.  *Id.*  For more than six years, the Bank has used various

incorrect valuation dates to justify both its failure to pay anything to LBSF and its claims for the

---

[2] Capitalized terms used but not defined herein shall have the meanings given them in the 1992
form (Local Currency-Single Jurisdiction) ISDA Master Agreement, dated as of April 5, 2000
(together with all schedules, annexes, and exhibits thereto, the "Master Agreement") and/or the
Complaint.

return of approximately $65 million in collateral that was held by LBSF under the Swaps.  *Id.*
¶ 1.  As the Complaint explains, had the Bank valued the Swaps appropriately as of the Early
Termination Date that the Bank itself chose, the Bank would have made a principal payment of
more than $150 million to LBSF and would have no bankruptcy claims against Lehman.[3]  *Id.*

On December 1, 2008, LBSF received a statement (the "Calculation Statement") from the
Bank containing its calculation of the termination payment with respect to the Swaps.  Complaint
¶ 29.  In preparing the Calculation Statement, the Bank stated that it had valued most, but not all,
of the Swaps by referencing replacement transactions it entered into over an extended period
***following*** the Early Termination Date, *i.e.*, from September 19, 2008 to September 30, 2008.  *Id.*
In the Calculation Statement, the Bank asserted that it did not replace approximately 71 of the
Swaps.  *Id.* ¶ 30.  The Bank claimed it calculated the values of those allegedly "unreplaced"
Swaps using models as of ***September 19, 2008*** rather than the September 18, 2008 Early
Termination Date.  *Id.*  Pursuant to this methodology of accounting for replacement values over
an extended period following the Early Termination Date and then using modeled values as of
September 19, 2008 for the 71 allegedly "unreplaced" Swaps, the Bank claimed that it was owed
a total of $64,497,844.43 by LBSF after adjusting for posted collateral and missed payments
under the Swaps.  *Id.* ¶ 31.

In September of 2009, about ten months after completing its replacement transactions and
sending a Calculation Statement to LBSF, the Bank filed two bankruptcy claims (together, the
"Original Claims") in the above-captioned bankruptcy case, asserting that LBSF and/or LBHI
owed it monies in connection with the Swaps – claim number 19165 (for $65,073,667) against

---

[3] Specifically, the value of the Swaps on the Early Termination Date after accounting for the
Bank's posted collateral and missed payments under the Swaps resulted in the Bank owing LBSF
more than $150 million in principal.  Complaint ¶ 14 n.3.

LBSF and claim number 19166 (for $65,073,667) against LBHI. *Id.* ¶ 41.  One month later, in October of 2009, the Bank filed amended claim number 42290 (for $64,889,951.59) against LBHI and amended claim number 42291 (for $65,489,786.59) against LBSF (together, the "First Amended Claims").  *Id.*  As with the Calculation Statement, in the Original Claims and the First Amended Claims, the Bank valued the 71 allegedly "unreplaced" Swaps using models as of September 19, 2008, rather than the September 18, 2008 Early Termination Date.  Moreover, the supporting documentation stated that the Bank obtained valuations from Principia Partners LLC based on modeled September 19, 2008 values of those 71 "unreplaced" Swaps.  *Id.* ¶ 46.

More than six years later, however, the Bank admitted that – over ten months before filing the Original Claims and the First Amended Claims – the Bank had entered into actual replacement swaps, leaving only 27 Swaps "unreplaced" and in need of valuation.  *Id.*  Under its very own, albeit incorrect, replacement theory, the Bank would have no possible reason to have used a model to value 44 of those 71 Swaps in either the Original Claims or the First Amended Claims (other than the inflation of those claims by use of model values rather than the actual replacement values that the Bank had used for all other Swaps that were actually replaced).  The Bank's supporting documentation for the Original Claims and the First Amended Claims also purportedly included "True Copies of Replacement Trade Confirmations," but the Bank did not include any trade confirmations for the 44 Swaps that the Bank replaced in October and November of 2008.  *Id.* ¶ 47.  The Original Claims and the First Amended Claims thus included material misrepresentations of fact to the Court, the public, and the estates of LBHI and LBSF about the absence of replacements for these 44 Swaps, and these misrepresentations concealed the absence of any possible justification for almost $20 million of the amount claimed against both LBHI and LBSF.

Nearly six years later, on May 5, 2015, just two weeks before LBHI commenced the above-captioned adversary proceeding, the Bank notified Lehman of its intent to file amended proofs of claim in the amounts of $45,491,534.16 against LBSF and $44,891,699.16 against LBHI, both of which also include a claim for "unliquidated damages and interest." *Id.* ¶ 42. About three months later on August 3, 2015, the Bank finally filed its revised claims for those amounts (Claim Nos. 68252 and 68253, together, the "Second Amended Claims"). In sum, the Bank reduced its claims by about $20 million against LBSF and the same amount against LBHI. The Bank's Second Amended Claims admit that the Bank actually had entered into replacement transactions for 44 of the 71 allegedly "unreplaced" Swaps between October 1 through November 17, 2008—prior to sending LBSF the Calculation Statement dated November 26, 2008 and well-before filing the Original Claims or the First Amended Claims. *Id.* ¶ 44. The Bank now contends that its Loss calculation should use the replacement values of the 44 replaced Swaps and admits that it can and should value the remaining 27 unreplaced Swaps using modeled values as of September 18, 2008. Motion at 6, 15-16. This Court can take judicial notice that the inflation of amounts in the Original Claims and the First Amended Claims had an adverse impact on the reserves held by the LBHI and LBSF estates and adversely impacted the amounts available for distribution to all other creditors of those estates during the first seven distributions under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* [ECF No. 22737].

The Bank's valuation of the Swaps falls into three distinct categories, which are summarized in the chart below.

| The Bank's Shifting Valuations of the Swaps | | |
|---|---|---|
| **Swap Valuation Category** | **The Bank's Flawed Valuations in its December 2008 Calculation Statement, Fall 2009 Original and First Amended Proofs of Claim** | **The Bank's Swap Valuations in its August 2015 Second Amended Claims** |
| **I.  285 Swaps the Bank Replaced *After* ETD in September 2008** | The Bank valued these Swaps using actual replacement transaction values from several dates *after* the September 18, 2008 ETD (*i.e.*, from September 19, 2008 to September 30, 2008). | Same. |
| **II.  44 Swaps the Bank Replaced in October and November of 2008** | The Bank claimed that 71 Swaps were never replaced and valued the Swaps as of September 19, 2008, *after* the ETD, using theoretical models. | In May 2015, the Bank admitted that 44 of the allegedly "unreplaced" Swaps actually had been replaced in October and November of 2008.  In August 2015, the Bank then filed Second Amended Claims using those 44 Swaps' actual replacement values. |
| **III.  27 Swaps the Bank Never Replaced** | The Bank included these unreplaced Swaps within the larger group of 71 Swaps that it alleged were "unreplaced" and valued the Swaps as of September 19, 2008, *after* the ETD, using theoretical models. | In May 2015, the Bank conceded that these 27 Swaps should have been valued as of the ETD all along.  In August 2015, the Bank then filed Second Amended Claims valuing these Swaps as of the September 18, 2008 ETD using theoretical models, *demonstrating that valuation as of the ETD is possible.* |

        In filing the Second Amended Claims more than six years after it terminated the Swaps, the Bank acknowledges that it inappropriately had misvalued the unreplaced Swaps, by amending those Swaps' valuation to be "as of" the Early Termination Date rather than as of September 19, 2008.  *See* Motion at 6, 15-16; Second Amended Claims.  The Bank also modified its prior valuation to use actual replacement values for the Swaps it replaced in October and November 2008, but its valuation remains improper as the use of those later dates does not comply with the plain requirements of the Master Agreement and section 562 of the Bankruptcy

Code.  The Bank's admission is too little, too late, and demonstrates the basis for LBHI's Good

Faith Claim and Equitable Subordination Claim, which rely on this manifest evidence of

inequitable conduct by the Bank.  Indeed, its improper valuation shows that the Bank is still all

too willing to use inconsistent and incomplete valuation methodologies when it results in a

valuation in the Bank's favor.

Specifically the Bank can, and must, value *all* of the terminated Swaps as of the September 18, 2008

Early Termination Date that the Bank itself chose; the Bank's failure to do so is inequitable and

has harmed Lehman and its creditors.  Specifically, for almost six years, Lehman has been forced

to maintain elevated reserves based on the Bank's inflated claims, which consequently has

reduced distributions during that period to all other creditors of LBHI and LBSF.

## II.    The Contract and Governing Law Mandate that the Bank Value the Swaps As Of the Early Termination Date.

Although the Bank moved to dismiss only LBHI's Good Faith Claim and Equitable

Subordination Claim, the Bank spends pages of its Motion trying to defend the propriety of its

valuation of the Swaps under the Master Agreement and section 562 of the Bankruptcy Code.

*See* Motion at 6-9.  Despite the Bank's contentions being immaterial to the challenged claims in

the Motion, the Bank's attempt to lay a factual foundation to support its valuation of the Swaps

proves that dismissal of LBHI's Good Faith Claim and Equitable Subordination Claim is

improper on a motion to dismiss.  Further, as LBHI established in the Complaint and will prove

at trial, it is plain that both the Master Agreement and section 562 of the Bankruptcy Code

require valuation of the Swaps to occur as of the Early Termination Date or as of the earliest date

thereafter as is reasonably practicable.  *See* Complaint ¶¶ 26, 34 (citing Master Agreement § 14,

11 U.S.C. § 562).  The primary motivation for the time constraint requiring the Non-defaulting

Party to determine Market Quotation or Loss *as of* the Early Termination Date or as soon as

reasonably practicable thereafter is to prevent an inaccurate valuation. *Id.* ¶ 33.

## LEGAL STANDARD FOR A MOTION TO DISMISS

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the

Court must assume the veracity of well-pleaded facts and determine whether they set forth a

plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). A claim is plausible

"when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 556 (2007)). A court must "accept as true all of the factual allegations

set out in the plaintiff's complaint, draw inferences from those allegations in the light most

favorable to the plaintiff, and construe the complaint liberally." *Rescuecom Corp. v. Google,*

*Inc.*, 562 F.3d 123, 127 (2d Cir. 2009) (internal citation omitted).

"A court's task in ruling on a [motion to dismiss] is 'merely to assess the legal feasibility

of the complaint, not to assay the weight of the evidence which might be offered in support

thereof.'" *Levitt v. Bear Sterns & Co., Inc.*, 340 F.3d 94, 101 (2d Cir. 2003); *Korova Milk Bar of*

*White Plains, Inc. v. PRE Props., LLC*, No. 11 Civ. 3327 (ER), 2013 WL 417406, at *5

(S.D.N.Y. Feb. 4, 2013) (a court must "test . . . the formal sufficiency" of the complaint "without

resolving . . . its substantive merits [or] weigh[ing] the evidence that might be offered in support

of Plaintiff's claims."); *Sapirstein-Stone-Weiss Found. v. Merkin*, 950 F. Supp. 2d 621, 625

(S.D.N.Y. 2013) (same).

Moreover, the Court may consider only the facts alleged in the complaint, documents

attached as exhibits or incorporated by reference, and matters appropriate for judicial notice

when ruling on the Motion. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322

(2007). Consideration of extraneous material when determining the sufficiency of a complaint

runs counter to the liberal pleading standard. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154-55 (2d Cir. 2002) (explaining that when a court considers extra-pleading materials, it risks depriving parties of a fair adjudication of their claims).

## ARGUMENT

### I.    LBHI's Good Faith Claim Is Well-Pleaded.

This Court has already addressed – and properly rejected – numerous arguments that a breach of the implied covenant of good faith and fair dealing claim is simply duplicative of a breach of contract claim.  In *LightSquared*, this Court found that the creation of a shell company to undertake actions that a corporation itself was unable to take was a breach of the implied covenant of good faith and fair dealing, even though a breach of contract claim had also been pleaded.  511 B.R. at 333.  Further, this Court already has instructed another litigant in the Lehman adversary proceedings who had sought to dismiss claims like LBHI's Good Faith Claim:  "some young person who works for [the defendant] didn't do their job.  Because if you look, you'd see it, [the Court's *LightSquared*] decision on the issue of the breach of the covenant of good faith and fair dealing."  *Lehman Brothers Holdings Inc. v. Wellmont Health System (In re Lehman Brothers Holdings Inc.)*, Ch. 11 Case No. 08-13555, Adv. No. 13-01719 (SCC) (Bankr. S.D.N.Y.), Tr. of Hr'g, Feb. 11, 2015, at 161:14-17.  After finding that LBHI was permitted to plead a breach of the implied covenant of good faith and fair dealing claim in the alternative to a breach of contract claim in *Wellmont*, this Court denied Wellmont's motion to dismiss.  *Id.* at 165:1-3 ("It's just kind of classic alternative pleading and the cases that say you can't do both, I think are just, you know, they're just a little misleading."); *id.* at 165:19-21 ("So I'm inclined to just deny the motion with respect to Count IV, leave it the way it is, and you know, let's move on.").  Here too, the Bank has failed to take the Court's *LightSquared* decision to heart by not even citing it in the Bank's argument to dismiss LBHI's Good Faith Claim.

Meanwhile, the Bank referenced *LightSquared* no fewer than four times in its argument regarding LBHI's Equitable Subordination Claim. *See* Motion at 14, 16.

Moreover, under New York law, every contract contains an implied covenant of good faith and fair dealing in the course of performance. *See Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*, 680 F. Supp. 2d 625, 631 (S.D.N.Y. 2010), *aff'd in relevant part*, 381 F. App'x 117 (2d Cir. 2010). That implied covenant is, in spirit "a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Id.* (citing *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995)); *see also Don King Prods., Inc. v. Douglas*, 742 F. Supp. 741, 767 (S.D.N.Y. 1990) ("The implied covenant [of good faith and fair dealing] . . . ensures that parties to a contract perform the substantive, bargained-for terms of their agreement and that parties are not unfairly denied express, explicitly bargained-for benefits."). While an implied covenant of good faith and fair dealing claim cannot purely duplicate a breach of contract claim, the claim may survive "if it is based on allegations different from those underlying the accompanying breach of contract claim." *Grand Heritage Mgmt., LLC v. Murphy*, 06 Civ. 5977 (NRB), 2007 U.S. Dist. LEXIS 83114, at *18 (S.D.N.Y. Nov. 6, 2007).

Further, Rule 8(d) of the Federal Rules of Civil Procedure, which is made applicable hereto by Rule 7008 of the Federal Rules of Bankruptcy Procedure, expressly permits a plaintiff to plead in the alternative. Fed. R. Civ. P. 8(d)(2) ("[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically"); Fed. R. Civ. P. 8(d)(3) ("[a] party may state as many separate claims or defenses as it has, regardless of consistency"); *see also U.S. Gypsum Co. v. Nat'l Gypsum Co.*, 352 U.S. 457, 467 (1957) ("alternative pleading is expressly sanctioned

by" Rule 8 of the Federal Rules of Civil Procedure).  This Court accurately summarized the state

of the law in its *LightSquared* decision, stating:

> While a party is precluded from recovering on both a claim for breach of the
> implied covenant of good faith and fair dealing and a claim for breach of contract
> at the same time (*see, e.g.*, *Hard Rock Cafe Int'l, (USA), Inc. v. Hard Rock Hotel
> Holdings, LLC*, 808 F. Supp. 2d 552, 567 (S.D.N.Y. 2007)), where the meaning of
> a cont[r]act is in doubt, a party may plead breach of the implied covenant of good
> faith and fair dealing as an alternative theory to its breach of contract claim.  *Id.*;
> *see also Fantozzi v. Axsys Techs., Inc.*, 2008 U.S. Dist. LEXIS 94040 (S.D.N.Y.
> Nov. 6, 2008) at *21-22. Here, LightSquared has asserted a single claim for
> recovery in the form of a breach of contract claim, presenting its equitable theory
> of breach of the implied covenant of good faith and fair dealing in the alternative,
> which the Court finds permissible.

*LightSquared*, 511 B.R. at 333 n.119.

Applying this Court's *LightSquared* holding, LBHI's Good Faith Claim should not be

dismissed because it provides an alternative route to recovery.  The Bank argues that it need not

value the Swaps using theoretical models as of the Early Termination Date and defends its

valuation of the Swaps using replacement values on dates **well-after** the Early Termination Date.

Yet, the Bank also admits that "whether conduct is 'inequitable' presents a 'slippery' issue

**generally inappropriate** for resolution on a motion to dismiss."  Motion at 15 (emphasis added).[4]

The Complaint is clear that even if the Bank's Swaps valuations were "technically permissible,"

they were nevertheless "intended to achieve a result that is prohibited by the agreement and

which would do away with the 'fruits' of the contract."  *LightSquared*, 511 B.R. at 333.  This is

because the Bank's valuation deprives LBSF of the benefit of its bargain under the Agreement

by arbitrarily choosing later dates on which to measure the termination value of the Swaps rather

than as of the Early Termination Date, as both the contract and section 562 of the Bankruptcy

Code require.  As the Bank acknowledges, whether the Bank's conduct "makes sense under the

Agreement and the law will eventually need to be decided."  Motion at 17.  Clearly such a

---

[4] *Id.* (citing *In re 80 Nassau Assocs.*, 169 B.R. 832).

determination is inappropriate in the context of a motion to dismiss.  Accordingly, LBHI's alternative Good Faith Claim should be allowed to proceed.  *Id.*; *see also* Fed. R. Civ. P. 8(d)(2)-(3); *see also U.S. Gypsum Co.*, 352 U.S. at 467.

Although LBHI's Good Faith Claim should survive as pleaded in the alternative, it should also survive for the independent – and even more compelling – reason that LBHI's Good Faith Claim allegations are not merely duplicative of LBHI's breach of contract allegations. LBHI has pleaded that "[b]y valuing the Swaps as of various dates over an extended period following the Early Termination Date and otherwise failing to use reasonable valuation practices and by failing to pay LBSF the substantial termination payment it is owed, [the Bank] breached the Master Agreement."  Complaint ¶ 57.  In contrast, LBHI's Good Faith Claim rests on (i) the Bank's bad faith in preparing the factually inaccurate and methodologically inconsistent Calculation Statement, and (ii) its prolonged (and inexcusable) failure to disclose highly relevant and material facts to Lehman and the Court through its repeated filing of inaccurate, incomplete, and inconsistent bankruptcy claims and the Calculation Statement.  *See* Complaint ¶ 63.

As the Chart on page 6 above demonstrates, the Bank has cherry picked when its valuation relies on replacement transactions and when it relies on modeled valuations for the Swaps – employing inconsistent valuation methodologies when doing so would inure to the benefit of the Bank's bottom line (and to the inequitable detriment of Lehman and its creditors). Complaint ¶ 48.  Even if the Bank's self-interestedly inconsistent Swaps valuations were permissible under some unstated theory, those valuation inconsistencies were not disclosed to Lehman and are baldly "intended to achieve a result that is prohibited by the agreement and which would do away with the 'fruits' of the contract."  *LightSquared*, 511 B.R. at 333.

Moreover, only this year – more than six years after terminating the Swaps – the Bank finally acknowledged that it actually had replaced 44 of the 71 allegedly "unreplaced" Swaps in October and November of 2008.  *See* Second Amended Claims.  Importantly, these 44 replacement transactions occurred *before* the Bank submitted the Calculation Statement to LBSF and filed the Original Claims and the First Amended Claims in this Court.  *See* Complaint ¶ 30. If the Bank had used replacement swap values for those 44 Swaps, the Bank would have reported a Loss amount tens of millions of dollars lower than what it claimed.  Had Lehman not initiated ADR and this adversary proceeding against the Bank, it is possible that the Bank's misrepresentations never would have come to light.

LBHI also has a good faith belief that the Bank engaged in additional inequitable and bad faith conduct that would support its Good Faith Claim and that the Bank, to date, has failed to disclose this conduct to the Court.  LBHI will move to amend the Complaint once LBHI has had an opportunity to engage in discovery.  *See* Fed. R. Civ. P. 15(a)(2) ("a party may amend its pleading only with . . . the court's leave.  The court should freely give leave when justice so requires").

Finally, by repeatedly filing false, inaccurate, and incomplete bankruptcy claims, the Bank has sought, inappropriately, to claim money from the Lehman estate and undermine the Bank's contractual obligations to LBSF.  All of these facts demonstrate that the Bank deliberately intended to deprive LBSF of the fruits of the Master Agreement, even if such conduct was "technically permissible" under the contract between the parties.  *See LightSquared*, 511 B.R. at 333.  For the foregoing reasons, dismissal of LBHI's Good Faith Claim is not warranted.

## II.    LBHI's Equitable Subordination Claim Is Well-Pleaded.

LBHI's Equitable Subordination Claim will become relevant only in the unlikely event that all other claims in the Complaint are rejected and some affirmative recovery is allowed against LBHI's or LBSF's estates on the Second Amended Claims.  Under those unexpected circumstances, this alternative claim provides a mechanism to compensate the other creditors of LBHI and LBSF for the harm resulting to them by the Bank's misrepresentations – repeated in the Calculation Statement, the Original Claims, and the First Amended Claims – that 44 Swaps were "unreplaced" when, in fact, all of those Swaps had been replaced at lower values than the asserted "modeled" values.  Other creditors have lost the use of money that would have been distributed to them if the Calculation Statement, the Original Claims, and the First Amended Claims had not been inflated without any legal justification (even under the Bank's flawed replacement-on-any-date controls theory).  This is precisely the type of harm from inequitable conduct that equitable subordination is intended to remedy.  As the Bank itself recognizes, "determining whether conduct is 'inequitable' presents a 'slippery' issue generally inappropriate for resolution on a motion to dismiss."  Motion at 15 (citing *In re 80 Nassau Assocs.*, 169 B.R. 832).  That should be the end of the analysis, and the Bank's Motion to dismiss LBHI's Equitable Subordination Claim should be denied.

The Bank does not seriously contend that LBHI's Equitable Subordination Claim is insufficient as a matter of pleading – *i.e.*, that LBHI failed to plead sufficient factual content to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  Instead, the Bank alleges that it "acted in good faith conformity with the Agreement in calculating its original claim" and that, therefore, its conduct was not inequitable.  Motion at 15.  The Bank is simply making a factual assertion about why this claim cannot succeed, which is not a proper basis for a motion to dismiss.  *Dujardin v.*

*Liberty Media Corp.*, 359 F. Supp. 2d 337, 347 (S.D.N.Y. 2005) ("In deciding a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), 'the court must accept as true all of the well pleaded facts and consider those facts in the light most favorable to the plaintiff.'"); *Iqbal*, 556 U.S. at 679; *Rescuecom Corp.*, 562 F.3d at 127; *In re G. Survivor Corp.*, 217 B.R. 433, 438 (Bankr. S.D.N.Y. 1998).  Moreover, the Bank's alleged factual contention is notably unsupported by any pleading, sworn affidavit, or evidence, making it completely unsuitable for a Rule 12(b)(6) motion to dismiss.  Further, the Bank contends that even if its conduct were inequitable, the Bank eliminated any harm to Lehman's creditors "in January 2015, months before this action commenced, when the Bank notified Lehman that it intended to reduce its claim by $20 million."  Motion at 15-16.  This allegation is factually inaccurate, relies on matters outside of the Complaint, and is pure argument, completely unsupported by sworn statement or one shred of evidence.  Indeed, Lehman could not adjust downwards its claims reserves until the Bank actually amended its inaccurate claims, which only happened in August 2015 – nearly six years after the Bank first filed its misleading and improper claims.  Consequently, in this context, the Court must accept LBHI's well-pleaded factual contentions as true and reject the Bank's unsupported factual allegations.

Even if the facts as pleaded are somehow deemed to be insufficient, LBHI has a good faith belief that the Bank engaged in additional conduct relevant to the Equitable Subordination Claim, and LBHI will move to amend the Complaint as soon as LBHI has had an opportunity to engage in discovery.  *See* Fed. R. Civ. P. 15(a)(2) ("a party may amend its pleading only with . . . the court's leave. The court should freely give leave when justice so requires").

The Bank's Motion is also deficient due to its failure to cite any case law indicating that filing false, inaccurate, and inconsistent bankruptcy claims – and standing on those claims for

15

more than six years – is not inequitable as a matter of law so as to require dismissal of LBHI's Equitable Subordination Claim. The conduct alleged in the Complaint unequivocally supports a valid equitable subordination claim. *See* 11 U.S.C. § 510(c); *ABF Capital Mgmt. v. Kidder Peabody & Co* (*In re Granite Partners*), 210 B.R. 508 (Bankr. S.D.N.Y. 1997) (listing examples of equitable subordination of claims "based upon a finding of actionable wrongdoing" and citing *In re 604 Columbus Ave. Realty Trust*, 119 B.R. 350, 377 (Bankr. D. Mass. 1990) (equitably subordinating a bank's claims based on its fraud and breaches of contract, among other things), *aff'd in part & vacated in part on other grounds*, 968 F.2d 1332 (1st Cir. 1992)). Thus, under Rule 8's liberal pleading standard, the Complaint unquestionably raises core equitable subordination issues sufficient to state a claim and should not be dismissed. *Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 388 (Bankr. S.D.N.Y. 2007) (Gropper, J.) (denying creditor's motion to dismiss, finding that the complaint raised core equitable subordination issues that were sufficient to state a claim).

In addition to being inaccurate at the time the Bank filed the Motion, the Bank's factual contentions as they relate to the impact of any bankruptcy claim reduction are inappropriate for this Rule 12(b)(6) Motion. "Courts generally do not consider matters outside the pleadings but may consider documents attached to, referenced in, or integral to the pleadings." *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 277 (S.D.N.Y. 2006); *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 379 (S.D.N.Y. 2013) (stating "the Court's review is ordinarily limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference"). "[W]hen matters outside the pleadings are presented [in support of or] in response to a 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the

complaint alone or convert the motion to one for summary judgment . . . ." *Chamberlain*, 986 F.

Supp. 2d at 379 (internal quotation omitted); *see also* Fed. R. Civ. P. 12(d); *Morgenstein v.*

*Motors Liquidation Co. (In re Motors Liquidation Co.)*, 462 B.R. 494, 509 n.72 (Bankr.

S.D.N.Y. 2012) (declining to convert a motion to dismiss for equitable mootness into a motion

for summary judgment and stating that the court "considers it preferable, whether or not such is

required, to defer consideration of the evidentiary facts suggesting equitable mootness until a

later time, if it ever becomes necessary").

Perhaps even more important is the fact that the Motion relies on nothing more than

attorney argument to support the Bank's contention that the "claim reduction already gives

creditors everything they could achieve through equitable subordination." Motion at 16. Just

like the Bank's factual assertion that its actions were not inequitable, this factual contention is

completely unsupported by ***any*** pleading, sworn affidavit, or admissible evidence. *See generally*

Motion. The Bank's assertion is also inaccurate, as explained below. The Court could have

converted the Bank's Motion into a summary judgment motion under Rule 12(d) and allowed

LBHI to respond with its own evidence pertinent to the Motion. *See* Fed. R. Civ. P. 12(d);

*Chamberlain*, 986 F. Supp. 2d at 379. The Bank's unsupported Rule 12(b)(6) Motion does not

afford LBHI that opportunity and, therefore, is patently inappropriate.

Here, the injury caused by the Bank's maintenance for more than six years of false

bankruptcy claims cannot be remedied by a simple amendment of those claims. Lehman's

considerable efforts over the past six years to understand the Bank's disingenuous valuations

were not without cost. Further, Lehman has been forced to maintain elevated reserves based on

the Bank's inflated claims, which reduced distributions to all other creditors of LBHI and LBSF.

Even though reserves have recently been modified in response to the Bank's just-filed Second

Amended Claims, Lehman was forced to maintain elevated reserves based on the false Original

Claims and First Amended Claims for almost six years, which prevented millions of dollars from

being distributed in the first seven distributions to creditors and which hurt creditors. Thus, even

if the Bank has amended its claims to correct the purportedly mistaken valuations, the harm

caused by the Bank on Lehman's estates is not so easily rectified. Consequently, the Bank's

effort to dismiss LBHI's Equitable Subordination Claim is woefully premature, unsupported, and

insufficient as a matter of law.

## CONCLUSION

For the foregoing reasons, LBHI respectfully respects that the Court deny the Motion in

its entirety with respect to the Good Faith Claim (Count II) and the Equitable Subordination

Claim (Count V).


Dated: August 10, 2015
       Washington, DC

/s/ Ralph I. Miller
Ralph I. Miller
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, NW, Suite 900
Washington, DC 20005
Telephone: (202) 682-7000
Facsimile: (202) 857-0940

Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Lehman Brothers Holdings Inc.*
*and Lehman Brothers Special Financing Inc.*